# OAKLAND MOTOR CAR COMPANY v. KREMER MOTOR COMPANY.[1]

July 8, 1932.

No. 28,757.

[1]Reported in 243 N. W. 673.

*Kingman, Cross, Morley & Cant,* for appellant.

*Harry S. Swensen,* for respondent.

DIBELL, J.

Action of unlawful detainer in the municipal court of Minneapolis. There was a verdict and judgment for the defendant. The plaintiff appeals.

■ The plaintiff, Oakland Motor Car Company, was the lessee for a term of years commencing on April 16, 1924, and ending on April 1, 1934, of property in Minneapolis designated numbers 1514 to 1520 on Hennepin avenue. On February 19, 1925, it sublet the property to the defendant, Kremer Motor Company, for a period commencing March 1, 1925, and ending February 28, 1926, at a rental of $684.38 per month; and in the instrument of sublease it was agreed that on or before 60 days prior to the expiration of the year the parties would agree upon a rental for the period commencing March 1, 1926, and ending April 1, 1934; and if the parties did not agree the Kremer company would surrender. The agreement recited that the Oakland company had been conducting in the property mentioned a branch house for the sale of automobiles and accessories, and the Kremer company was desirous of taking over the business. Three contracts were contemplated, all to be of even date, February 19, 1925. It is quite impossible to get a complete notion of what was in mind without quoting to a considerable extent from what we may call the agreement for lease and from some of the other contracts. The lease agreement provided:

"WHEREAS Oakland is engaged in selling automobiles, parts, accessories, etc., and has been conducting a branch house in the City of Minneapolis, Minnesota, at 1514-20 Hennepin Avenue, and

"WHEREAS Oakland has entered into an indenture of lease as Lessee of the above mentioned premises, and the term of said lease not having expired, and

"WHEREAS Oakland is desirous of discontinuing the said branch house business, and Kremer is desirous of taking over said business, and purchasing certain of the property of Oakland owned or used in connection therewith,

"Now THEREFORE, in consideration of the premises and other good and valuable considerations, and the mutual covenants and condi-

458

tions hereinafter contained, it is agreed between the parties as follows:

"FIRST. Oakland agrees to sublet to and Kremer agrees to sublease from Oakland, for the term beginning March 1st, 1925, and ending February 28th, 1926, all of the said premises known as 1514-20 Hennepin Avenue, Minneapolis, Minnesota, which are now under lease between Oakland and Clarkson Lindley under date of December 1st, 1923, and which is for the term commencing April 16th, 1924, and ending April 1st, 1934, and for which premises Kremer agrees to pay Oakland Six Hundred Eighty-four Dollars and thirty-eight cents ($684.38) per month on the first day of each and every month during the said term of one year; and it is further agreed that on or before the sixtieth day prior to the end of the said one year term the parties hereto shall mutually agree upon a rental to be paid for the said premises by Kremer to Oakland for the period commencing March 1st, 1926, and ending April 1st, 1934. If the parties do not agree upon a rental so as to be charged for the last mentioned period, then the sublease between the parties hereto shall come to an end on February 28th, 1926, at which time Kremer shall peaceably yield up and surrender the said premises to Oakland.

"The said sublease shall be subject to all the terms and conditions except as to the payment of rental which are provided in the lease of said premises between Oakland and Lindley.

"SECOND: (a) Simultaneous with the execution and delivery of this agreement there shall be also executed between the parties hereto a certain agreement which is designated 'Oakland Selling Agreement (Direct Dealer)' and an appendix thereto which is designated 'Appendix to Oakland Direct Dealer's Selling Agreement for 1925 Season', which when executed shall be marked Exhibits '1' & '2' respectively, and attached hereto and made a part hereof with the same force and effect as if re-written herein.

"(b) The territory in which Kremer shall sell Oakland automobiles, parts and accessories to be acquired by it from Oakland shall be the same as the territory designated in said appendix."

It was then stated that the Kremer company was to buy from the Oakland company all of the automobiles and accessories and parts on hand in the property leased, together with the property in the miscellaneous inventory, for which it was to pay $2,500 in cash and the balance in monthly payments in the year 1925.

The Kremer company was given the exclusive selling rights in the territory mentioned in the appendix and was to sell no other than Oakland autos. The two closing paragraphs of the sublease agreement are as follows:

"It is understood and agreed that provided Kremer has carried out the terms of this agreement (including Exhibits 1 & 2), and Oakland should at any time exercise its privilege of cancelling the said selling agreement, the said sublease herein stipulated to be entered into shall be terminated and cancelled, such termination and cancellation to become effective at the same time as the cancellation of said selling agreement.

"Kremer agrees to furnish to Oakland's District Manager in the territory of which Minneapolis forms a part adequate office space for his requirements, and that of his staff, which shall be free of charge and in consideration of the execution of these presents on the part of Oakland."

The contemporaneous selling agreement, as far as immediately important here, was as follows (the Oakland company being referred to as the "seller" and the Kremer company as the "direct dealer"):

"Seller hereby grants to Direct Dealer the concession to sell new Oakland automobiles, chassis, parts and accessories in the territory (but not elsewhere) described and set forth in the 'Appendix' hereto, and which 'Appendix' is made a part of this agreement as fully as if it and all of the matters therein contained were embodied in this agreement.

"Direct Dealer hereby accepts the above concession and agrees to make all sales hereunder in accordance with this agreement. Direct Dealer further agrees to work and develop to the satisfaction of

Seller the aforementioned territory and not to sell any of such automobiles or chassis outside thereof. Should any such automobile or chassis sold by Direct Dealer be used in the territory of another Direct Dealer, Direct Dealer agrees to abide by the decision of Seller regarding the division of compensation due Direct Dealer with such other Direct Dealer in whose territory such automobile or chassis is used.

\* \* \* \* \*

"This agreement shall continue in force and govern all relations and transactions between the parties hereto until cancelled or terminated. Either party may cancel or terminate this agreement at any time with or without cause, provided the party desiring to so terminate and cancel the same gives unto the other a written notice (by registered mail or other means of delivery) of such intention at least thirty days prior to the date of such proposed termination and cancellation."

There were further provisions that there should be no change in the printed forms; that the exclusive selling privilege was given the direct dealer subject to the seller's limited reserved right; that associate dealers be appointed by the direct dealer with the approval of the seller; and there was a provision that the parties might at any time during the continuance of the agreement execute an appendix which would be attached to the agreement and form a part of it as fully as if included in the body of the writing.

There was then a provision about the formal making of contracts, which is important in view of the execution of an instrument waiving the right to an arbitrary cancelation of the lease and selling agreement on behalf of the Oakland company by Herbert G. Derrick, whose authority is questioned, which is as follows:

"This agreement is not valid until and unless approved by the General Sales Manager or duly authorized executive officer of the Oakland Motor Car Company, without any change or alteration of the printed form hereof, at the Home Office of the Oakland Motor Car Company at Pontiac, Michigan."

The agreement was signed in the name of the Oakland company by H. E. Mahaffey, district manager, and approved for the company by W. R. Tracy, assistant sales manager, and Norman Way, comptroller. Below the signatures was a statement in parentheses as follows:

"Company signatures must be signed by an officer of the Company, with title shown."

The appendix was at great length, referring to:

(1)  Granting of selling privileges and the territory of the direct dealer.

(2)  Acceptance and agreement to sell as directed by the seller.

(3)  A statement that the direct dealer was not made the agent of the seller.

(4)  A provision fixing the continuance of the term and the rights of the seller and dealer to cancel with or without cause upon 30 days' notice.

(5)  A statement that no changes from the printed form are permitted.

(6)  A statement of the exclusive selling privilege of the direct dealer and the seller's reserved right.

(7)  Payment by direct dealer.

(8)  Shipping schedule.

(9)  Shipments from branches.

(10)  Unshipped orders.

(11)  Automobiles ordered in excess of allotment.

(12)  Direct dealer's business to be conducted in a way satisfactory to seller.

(13)  Common carriers are agents of direct dealer.

(14)  Repair parts, stocks, and prices to direct dealers.

(15)  Return of parts and accessories.

(16)  Associate dealers to be appointed by direct dealer with approval of seller.

(17)  Seller's right to repurchase when agreement is terminated.

(18)  Collection of freight and handling charges.

(19) Right to the use of the name "Oakland."

(20) Agreement not assignable.

(21) Right of seller to cancel.

(22) No implied waivers.

(23) Law of agreement to be governed by laws of Michigan.

(24) Warranty.

(25) Change of models.

(26) Renewal of appendix.

(27) Subrogation of seller to direct dealer's relations with associate dealers.

(28) Authority to make agreement, which is similar to that contained in the selling agreement as follows:

"This agreement is not valid until and unless approved by the General Sales 'Manager or duly authorized executive officer of the Oakland Motor Car Company, without any change or alteration of the printed form hereof, at the Home Office of the Oakland Motor Car Company at Pontiac, Michigan."

The appendix was executed in the name of the company and by the same persons as the selling agreement.

On the tenth day of February, 1926, within the year specified in the agreement of lease of February 19, 1925, the parties entered into an agreement extending the term until April 1, 1934, and fixing the rental at $1,368.75 per month, or $16,425 per annum. As far as important that agreement is as follows:

"WHEREAS, the parties hereto heretofore, under date of February 19th, 1925, entered into an agreement whereby Oakland sublet to Kremer premises known as 1514-1520 Hennepin Avenue, Minneapolis, Minnesota, which premises Oakland had theretofore leased from Clarkson Lindley under lease dated December 1st, 1923, by which agreement of February 19th, 1925, it was agreed that Oakland sublet the said premises to Kremer for a period of one year, commencing March 1st, 1925, and ending February 28th, 1926, at a rental therein agreed upon, and for a further term, commencing March 1st, 1926, and ending April 1st, 1934, provided the parties hereto should on or before sixty (60) days prior to the end of said

term of one year mutually agree upon a rental to be paid for said premises by Kremer to Oakland for the further term commencing March 1st, 1926, and ending April 1st, 1934; and

"WHEREAS, the parties hereto have heretofore agreed upon the rental which shall be paid by Kremer and received by Oakland for said additional term from March 1st, 1926, to April 1st, 1934;

"Now, THEREFORE, in consideration of the premises, and of the mutual agreements contained in said lease of February 19th, 1925, it is hereby covenanted and agreed that the rental to be paid by Kremer and received by Oakland for the aforesaid premises for the term commencing March 1st, 1926, and ending April 1st, 1934, shall be at the rate of One Thousand three hundred and sixty-eight Dollars and seventy-five cents ($1,368.75) per month, payable on the first day of each and every month during the said term. It is hereby mutually covenanted and agreed that the said agreement of February 19th, 1925, shall in all respects govern and control the term of said letting except as herein modified as to rental, and except as modified in a certain agreement dated the 27th day of April, 1925, between Oakland and Kremer, whereby Oakland agreed to vacate a certain portion of the premises formerly occupied by its District Manager, which space was reserved to Oakland in the said lease of February 19th, 1925.

"The said lease of February 19th, 1925, except as modified by this agreement and the said agreement of April 27th, 1925, being in all respects hereby ratified and confirmed."

The agreement of April 27, 1925, as far as at all important here, eliminated the rental of $684.38 in the lease of February 19, 1925, and substituted in lieu thereof a rental of $709.38, commencing on April 1, 1925, and ending on February 28, 1926, and the parties by the agreement in all other respects ratified and confirmed the lease of February 19, 1925.

The parties, with the agreement of February 10, 1926, thus executed, were in this position. The plaintiff was the lessor and the defendant the lessee of the Hennepin avenue property first described, the term expiring on April 1, 1934. The rent was $16,425 per an-

num. The defendant had from the plaintiff a sales agreement expiring on the same date. In the sales agreement it was agreed that either party with or without cause might terminate upon 30 days' written notice.

■ Matters ran along, and there was talk of reducing the overhead. The plaintiff consulted with its various district dealers and suggested to them the desirability of their reducing overhead and conferring with their lessors on the proposition of a rent reduction. In the case of the defendant it meant a rent reduction by the plaintiff to the defendant. Considerable discussion followed, and two or more officers conferred with the defendant with the result, so there is evidence to show, that it was agreed that for the stated monthly rental there would be substituted a volume of business charge. The understanding was incorporated in a letter of October 2, 1930, signed by H. E. Mahaffey, western sales manager of the plaintiff, as follows:

"Confirming our wire, wish to say that Mr. Blees and Mr. Glancy have reviewed this case very thoroughly and their decision is as follows:

"That they will stand by the offer made by Mr. Blees at the time he was in Minneapolis, and that is they will date this from January 1st, 1930, for the balance of the period of the lease on a volume proposition. Each years rent would be based as follows:

"Fifteen dollars ($15.00) per car retailed, and five ($5.00) per car wholesaled; or in other words, for each car you retail you would pay $15.00 rent and for each car you wholesale, you pay $5.00.

"Naturally, during the poor years this gives you the advantage. We trust that this is entirely satisfactory to you."

We do not see so great importance in this change as is claimed by the defendant; but that such a change was made and acted on by the parties is without dispute; and it was made by oral negotiations and a final letter and was acted upon without questioning its validity. It does show that modifications were made without much formality and were recognized as binding.

The record does not show definitely how well the business was proceeding. It is inferable that trade was not good. The necessity of economy prompted the plaintiff to suggest to its direct dealers that they be careful of their overhead. There is evidence of some complaining and dissatisfaction, but the plaintiff did not assert a right to cancel the lease or contract because of any wrongdoing or failing on the part of the defendant. On April 23, 1931, it wrote a letter to the Kremer company as follows:

"You are hereby notified that the undersigned, Oakland Motor Car Company, elects to cancel that certain selling agreement entered into between your Company and the undersigned under date of February 19th, 1925, and all supplementary and subsequent contracts and agreements, including that certain selling agreement entered into between your Company and the undersigned under date of December 23rd, 1930, and the appendix to said selling agreement of the same date, and all agreements subsequent thereto, said cancellation to take effect on the 31st day of May, 1931.

"You are further notified that by reason of such termination and cancellation of said agreement dated February 19th, 1925, the lease under which you occupy the premises, 1514-16-18-20 Hennepin Avenue, Minneapolis, Minnesota, which is a part of said agreement, is terminated and cancelled.

"You are further notified that by reason of the cancellation and termination of said selling agreement and said lease the said Oakland Motor Car Company is entitled to possession of said premises and hereby demands that you quit said premises on or before the 31st day of May, 1931, and that you deliver possession thereof to the said Oakland Motor Car Company, or its representatives, on or before the 1st day of June, 1931.

"We are taking the precaution of giving you this further and complete notice for the reason that you have taken exception to the sufficiency and the manner of the service of the notice of concellation which was sent to you under date of February 14th, 1931. Inasmuch as we have by the serving of this notice met all of your objections to the first notice, we assume that there will be no ques-

tion about your giving us possession of the said leased premises on or before June 1st, 1931.

"Under date of April 11th, 1931, we offered in writing to re-purchase current cars and parts in your possession, and in reply you refused the offer for the reason that you questioned the suffi-ciency of the cancellation of the sales agreement between us. In view of the serving of this notice upon you and in order to con-tinue to show our good faith in the matter, we again offer at this time to re-purchase from your Company, subject to our inspec-tion and acceptance, at the current dealer price, plus the actual freight paid thereon, all new and unused current model Oakland and Pontiac Motor Vehicles and chassis, and all new and current model unused parts and accessories in saleable condition on hand in your place of business and in your possession, in accordance with the terms of the selling agreement."

It will be noticed that this cancelation was based solely upon the provisions in the selling agreement of February 19, 1925, and a further agreement of December 23, 1930, hereafter to be noted, the cancelation to be effective on the 31st of May, 1931. The purpose was to cancel both the sublease and the sales agreement. The plain-tiff did not assert a cause of cancelation because of any wrong done by the defendant or because of its failure to conform to the cove-nants of the agreement. It grounded its right of cancelation solely upon the provision in the agreement, and of course it had the right to cancel arbitrarily, and the defendant had the same right. If the case stopped at this point the verdict would be for the plaintiff.

■ The cancelation was effective if the right to cancel remained as it was given in the agreement of February 19, 1925. The de-fendant claims that the agreement was not existent on April 23, 1931, for reasons now to be stated.

The Kremer company had a service station a short distance away at 1411 Yale Place. There is evidence that the plaintiff was de-sirous that the defendant's service station be moved to property adjoining that described in the sublease, that is, numbers 1514 to 1520 Hennepin avenue. This property was owned by the party who

was lessor to the plaintiff of the property which it sublet to the defendant. Dr. Kremer, the president of the defendant, testified that on or about January 18, 1930, he had a conversation with H. G. Derrick, zone manager for the plaintiff, relative to the removal of the station. The defendant had maintained the station at a profit for many years. He states part of the conversation to be as follows:

"Mr. Derrick renewed his demand that we move our service department from 1411 Yale Place to Hennepin avenue and insisted that we rent the two corner buildings referred to from Mr. Lindley for that purpose. He had learned the buildings were available, but on a long-time lease; nothing less than five years. I objected to doing so—

Q. "You told him you objected?

A. "I told him I objected on the ground we had a month to month lease at 1411 Yale Place at a lower cost and that it would be a very expensive matter for us to move. Also, that I didn't feel that it was a safe business venture because of the existence in the lease and contract of a cancelation clause which, while they had promised should never be used against us except for cause, yet stood there. Mr. Derrick was very insistent because of the fact that factory officials, he informed me, wanted this change made in order that we might be better situated and equipped for the rendering of service. I told him that unless we could have renewed assurance that that cancelation clause should not be used against us except for cause, that I would not—

Q. "Until what time—until when?

A. "Until the expiration of the lease and contract on April 1, 1934; that I wouldn't obligate the company by renting the buildings for a period of four or five years. He wanted to know what would satisfy me, and I told him that if he would state in writing that we should not be disturbed until the expiration of the lease and contract and put it over his official signature that I would consent to take on the new buildings. He consented, and he put it in writing."

Derrick in the name of the company on January 18, 1930, wrote a letter as follows:

"Kremer Motor Company,
"Minneapolis, Minn.

"Gentlemen:

"Relative to your objections to making a long term lease on the buildings on the corner with Lindley and moving your service station over there because of the thirty-day cancellation clause which appears in your contract under which you purchased the Branch wish to advise that this move on your part is necessary in order for you to conform with the factory's program for the future and in line with the writer's requests.

"You may rest assured that we will not take advantage of the cancellation clause as long as your performance continues in the same fine manner that it has in the past.

"This letter is sufficient assurance on our part that your contract will not be interfered with at least until the end of your lease with us, if then, and you know that runs until April 1st, 1934.

"This assurance on our part fully warrants your immediate action in going ahead and closing up with Lindley and complying with our requests to conform with the new Oakland policies and expansion program.

"I sincerely trust that the next time the writer calls upon you that you will be able to show me some concrete evidence of your intentions to carry out the program as agreed so that I can show the factory officials at auto show time what the Kremer Motor Company's future plans are.

"Yours very truly,
"Oakland Motor Car Company
"H. G. Derrick, Zone Manager."

On February 11, 1930, the Kremer company leased the property from 1522 to 1530 Hennepin avenue at $650 per month for a term expiring on April 30, 1934. The claim of the defendant is that by this agreement, of which the letter was a part, the plaintiff released

or waived its claim to a right of forfeiture without cause; and the claim of the plaintiff is that Derrick, without authority, wrote the letter, not in the course of business but outside of the office, on plain paper, and with the purpose of aiding the Kremer people, and substantially that the so-called agreement was but a sham. The defendant moved its service station in accordance with what it claims the agreement was. In September, 1930, Dr. Kremer says he had a conversation with the president of the plaintiff at Pontiac, and this is what he says was a part of it:

"I discussed the situation with reference to claims that we had against—unsettled claims that we had against the Oakland Motor Car Company. I discussed with him the move that we had made; discussed how it was working out. Told him at that time that I had entered into a contract with the zone manager, Mr. Derrick, a written contract—or written agreement rather, whereby he had renewed the assurance that we were not to be disturbed in our lease and contract until its termination in 1934, except for cause, and he expressed himself as being entirely satisfied with it, and I told him I had brought the matter up because I wanted to know whether Mr. Derrick had sufficient authority; if not, I was not going to ride him for more, and he said Mr. Derrick had full charge of his zone, and all things pertaining to it, and what he had done was all right, and he approved it in that conversation."

And referring to a conversation had with certain officers of the plaintiff in February, 1930, Dr. Kremer testified:

Q. "With whom did you have a conversation?

A. "Mr. Tracy and Mr. Mahaffey. Mr. Tracy and Mr. Mahaffey.

Q. "Do you know what position Mr. Tracy had with the company at that time—the Oakland?

A. "Yes.

Q. "What was it?

A. "Vice president in charge of sales.

Q. "And Mr. Mahaffey?

A. "Was—I think his title was western sales manager.

470

Q. "What was the conversation—where was it?

A. "In my office at 1518 Hennepin avenue.

Q. "Anyone else present at that time?

A. "Not when I talked to Mr. Tracy.

Q. "Tell us of your talk with Mr. Tracy.

A. "With Mahaffey—I talked to them separately.

Q. "Do I understand you were talking to both Mr. Mahaffey and Tracy at the same time?

A. "No.

Q. "Let's take them one at a time. Well, Mr. Mahaffey first.

A. "I asked Mr. Mahaffey to tell me what his present attitude was with reference to the cancelation clause in the contract, because we were taking on this new building and I wanted to know, and he said, 'You have nothing to fear. No advantage will ever be taken of that, it is understood and everybody knows it, and you can rest perfectly easy. I have told you a dozen times before—everybody understands it.'

Q. "Understands what?

A. "That the contract is a noncancelable contract—you bought and paid for it—sold as a branch.

Q. "Mention the lease in that connection?

A. "Yes, lease and contract, both.

Q. "That was with Mr. Tracy?

A. "With Mr. Mahaffey.

Q. "Now, did you have a conversation about that time with Mr. Tracy?

A. "I had a conversation at the same time with Mr. Tracy.

Q. "All right. What was that? Where was it held?

A. "That was held in my office.

Q. "All right, what of it?

A. "At 1518 Hennepin avenue. Mr. Tracy and I sat down for a private conference on things that were of interest, and the thing of interest to me was the cancelation contract—or of the cancelation clause in the contract, and applying to the lease. I recall, or I asked him, what his attitude with reference to it was, and he said

to me that there would be no cancelation of either contract or lease until 1934.

Q. "But you mentioned that Mr. Derrick had signed an agreement on January 18, 1930—along about that time?

A. "I did.

Q. "What did they say in regard to his action?

A. "They said it was all right, and they approved it."

The evidence narrated, if worthy of belief, was sufficient to show that the officers of the plaintiff understood that a written agreement of some kind had been made on behalf of the company with the defendant whereby it was to have the lease until April 1, 1934, without a right of cancelation arbitrary in character and without cause such as was specified in the sales contract. This was based on the removal of the service station from Yale Place to the property adjoining its subleased property. Plaintiff considered it an advantage to have it there. If the evidence is believed, it thought it such advantage to have it there that it was willing to forego the right, which it had reserved of arbitrary cancelation. The defendant procured the lease and subjected itself to a rental of $7,800 a year for a period of more than four years, a total of over $30,000, and underwent the expense of moving from a place where it was at the time doing a profitable business.

■ The plaintiff claims that the provision for a termination with or without cause could not be changed except in writing because of the statute of frauds and unless upon consideration; and that there was neither.

If the change was no more than a waiver, the statute of frauds does not trouble though it be that there was no writing and no consideration. Bemis Bros. Bag Co. v. Nesbitt, 183 Minn. 577, 237 N. W. 586, and cases cited; Minneapolis E. L. Co. v. Federal Holding Co. 175 Minn. 421, 221 N. W. 645, and cases cited. Whether there was merely a waiver or an actual change of a term or a modification of the contract we need not determine. The letter was enough of a writing. Considering the course of business, there was a sufficient execution, and the change of the contract was a corporate act.

■ The recital of what was done by the Kremer company leaves no question of sufficiency of consideration. It gave up a profitable service station on Yale Place. It assumed a total rental liability of more than $30,000 for the next four years. It went to the expense of moving. The case of Minneapolis E. L. Co. v. Federal Holding Co. 175 Minn. 421, 221 N. W. 645, forecloses any genuine controversy.

So at this time a verdict for the defendant is sustainable.

6. Under date of December 23, 1930, the Oakland company wrote to the Kremer company stating that effective from January 1, 1931, the selling agreement would be modified in certain respects which were of some importance. The modification was to expire automatically December 31, 1931. On the same day, December 23, 1930, an agreement in form was made by the two companies. The substitution of one for the other furnished a consideration. The new agreement contained the provision in the other contracts, found in paragraph four of the selling agreement, as follows:

"Either party may cancel or terminate this Agreement at any time, provided the party desiring to so terminate and cancel the same gives unto the other a written notice (by registered mail or other means of delivery) of such intention at least thirty days prior to the date of such proposed termination and cancellation."

It was executed in the name of the plaintiff by W. J. Bryan, zone sales manager, and for the Kremer company by George E. Kremer, treasurer, who, it should be noted, is not the Dr. Kremer often mentioned. Dr. Kremer, referring to a conversation occurring in November or December, 1930, with Mr. Bryan, representing the plaintiff, relative to a change of contract, said:

"Mr. Bryan came up, called at the office and talked to me about a new contract, and I inquired what the new contract embodied—we had a contract already. I questioned him with reference to it, and he explained the terms of the contract, that it was to be a direct contract with the Oakland Motor Car Company, that it embodied the rearrangement of our territory in a way that lost us control of it, and I told him under no circumstances would I consent to giving

up rights that now existed and transfer it to a contract of that kind which took away from us, according to his own statement, everything of value in the contract we now had."

His testimony further is that there was no corporate action shown on the books of the company relative to a contract of December 23, 1930. George E. Kremer testified that he was an officer of the Kremer company from 1915 until 1929 and that about the middle of August or the first of September of the latter year he resigned and had not since been an officer or a director or a stockholder. In 1930 he was in Florida. He says he had a conversation with Bryan relative to a new contract upon his return and that he told him that he was not an officer of the Kremer company and had not been since 1929; that he told him:

"I had no authority to sign any contracts or agreements for and on behalf of the Kremer Motor Company. He asked me specifically if I didn't have."

His testimony is unsatisfactory. He says he told Bryan that he would sign the contracts in accordance with their agreement relative to forming a new company under the laws of South Dakota to handle the "drive-outs" from the Minneapolis district that were going to dealers who did not carry a large stock. He gives the inference that all this had nothing to do with the Kremer company but was an affair between him and Bryan and perhaps some others, the definite character and purpose of which is not shown. He claims that he had like conversations with Mahaffey, Grady Gamble, Derrick, and Sloan, who represented the plaintiff, and that he stated that he had no authority to enter into a contract on behalf of the Kremer company. There is some evidence that he was held out by the defendant as an officer having apparent authority. The doctrine of apparent authority is considered in Columbia Mill Co. v. Nat. Bank of Commerce, 52 Minn. 224, 53 N. W. 1061; Dispatch Printing Co. v. Nat. Bank of Commerce, 109 Minn. 440, 124 N. W. 236, 50 L.R.A.(N.S.) 74; Johnson v. Evans, 134 Minn. 43, 158 N. W. 823; 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 156. The question of

the fact and effect of a holding out was submitted to the jury, and it, we must assume, found favorably to the defendant. The evidence did not require a different finding.

It may be doubted whether it was intended by either company that the agreement of December 23, 1930, would effect a reinstatement of the early cancelation clause. It was perhaps directed to other purposes. It could be found by the jury that Kremer had no authority—could be found so very easily—and it could be found that he so informed the officers of the Oakland company and that he was not held out by the defendant as having apparent authority; and so whatever the company did with reference to the December 23, 1930, contract was at its peril, and that it was still without the right of arbitrary cancelation without cause.

If we are right so far, and there is nothing to change the situation, the verdict for the defendant is sustainable.

7. On January 1, 1930, the plaintiff gave the defendant a bound pamphlet of some 50 pages, of size about six by twelve inches, called "Field Manual of Policies and Instruction." It was received in evidence upon the offer of the defendant over the objection of the plaintiff. It set out the company's plan of organization and the policy which should be used for the good of the organization and those concerned with it. In a way it was intended to help the morale of the organization and induce coöperative working. The bad business conditions of the time doubtless were appreciated. It referred to the duties of the direct dealer to others and of others to the direct dealer. It referred to the undesirability of cancelations and the matter of placing a direct dealer on probation in the event of trouble coming to him. This referred to something apart from the absolute right of cancelation which existed by the terms of the original agreement.

The manual of instructions bore notice that it was issued January 1, 1930. There had been other manuals, and there were revisions as occasion suggested. It is difficult to fix their legal status. Under the head of *"Cancellation of Agreements—Introduction,"* the manual says:

"Because of the fact that in the past year certain conditions have developed which require a more definite explanation of our cancellation policy and follow up after cancellation, it has become necessary for us to incorporate at this time all such possibilities and changes so that we may have a definite procedure on cancellations."

Continuing, it said that the cancelation of a selling agreement required caution and the use of judgment. It might be unfortunate or unjust to both seller and direct dealer. It stated that the contract of a direct dealer who had not abided by the selling agreement could not be removed until formal cancelation was written, and apparently in explanation says:

"Consequently, we protect ourselves in Clause 4 of the Agreement to the extent that the Oakland Motor Car Company may terminate the Selling Agreement by giving the Dealer thirty days advance written notice of its intention to do so.

"Likewise in Clause 4 of the Selling Agreement provision is made whereby the Direct Dealer or the Associate Dealer may similarly terminate the Selling Agreement by giving the other party thirty days advance written notice."

Clause 4 provides:

"This agreement shall continue in force and govern all relations and transactions between the parties hereto until cancelled or terminated. Either party may cancel or terminate this agreement at any time with or without cause, provided the party desiring to so terminate and cancel the same gives unto the other a written notice (by registered mail or other means of delivery) of such intention at least thirty days prior to the date of such proposed termination and cancellation."

The manual continues to say:

"Clause 21 of the agreement defines the causes and permits the agreement to be declared terminated and cancelled without any notice whatsoever to the Dealer."

Clause 21 is as follows:

"In case Direct Dealer is a co-partnership or a corporation, and disagreements of any nature shall arise between the members of the co-partnership or the officers or managers of the corporation, whereby Seller deems its interests may be imperiled, or in case of the incapacity, death or insolvency of Direct Dealer, or in case an application is made to have Direct Dealer declared bankrupt, or in case a Receiver or Trustee is appointed for Direct Dealer, then Seller may at its option cancel this agreement without any notice whatsoever to Direct Dealer."

The manual then explains the three classes of cancelation. It was not made a part of the sales agreement nor a part of the appendix nor a substitute for it. It was not a new contract. It was in the nature of a book of instructions and contained suggestions valuable to the direct dealer and to others. Doubtless manuals of this sort are used in similarly highly organized corporations. We find nothing in it indicative of a purpose on the part of the seller to relinquish its right, which was a part of the original contracts, to cancel without cause, just because it wanted to do so, any more than an assent on the part of the direct dealer to relinquish its right to cancel the contract and quit the business if it chose to do so. It gave no right of probation as against a right to cancel without cause. It did relate to the method of procedure when someone was not getting along well and needed guidance. It did not limit the arbitrary right of cancelation without cause. We do not see the importance of the manual upon the issue before us.

The court charged the jury as follows:

"As a further defense the defendant claims that early in the month of January, 1930, an agreement was made by the parties to this action whereby it was agreed that before the plaintiff could terminate the selling agreement and lease had between them by invoking the cancelation clause in the agreement of February, 1925, that certain conditions precedent as set forth in defendant's exhibit 1, that is the book manual, as set forth in defendant's ex-

hibit 1, relating to the termination of a sales agreement between the plaintiff and its direct dealers should first be complied with by the plaintiff and among other conditions that the defendant should first be placed upon a 30- or 60-day probation by the plaintiff, that the plaintiff did not comply with these conditions and that such an agreement—and that plaintiff did not comply with such conditions and with such an agreement and that the 30-day notice of attempted cancelation as actually served upon the defendant was premature and ineffectual to terminate the sales agreement and lease of the parties, if you find that such an agreement was entered into between the Oakland Motor Car Company and the Kremer Motor Company and that such agreement was in force at the time when the alleged notice of cancelation was served on the defendant, then you are instructed that such an agreement, if made between the parties, was a modification of the original lease and agreement; but on the other hand, if you find that such an agreement was not made between the parties, then you should find that such a claim was not a modification of the original lease and sales agreement."

The charge gave an opportunity for the application of the defendant's claim that it had not been given the contractual right to a period of probation—a right which we hold it did not have. The foundation for it was made in counsel's argument. The introduction and use of the manual cannot be overlooked. But for the use made of the Field Manual of Policies and Instructions the verdict rendered would stand. Putting it in another way, a finding that the agreement of December 23, 1930, executed by George E. Kremer, was executed without authority, which we must suppose was made by the jury, was sustained; also that there was no ratification. And so the verdict would stand, it having been found before that the original right to cancel without cause before the termination of the term in 1934 had been contracted away by the plaintiff; but the introduction of the field manual with a charge that its effect might be to prevent a cancelation without cause brings the trouble. We do not know upon which of the grounds stated the jury decided. If it decided for the defendant on the effect claimed by it of

the field manual there was error in the verdict. The record does not show which view it took on the question of the effect of the December 23, 1930, contract or the field manual, and error inheres in the verdict.

We have not dealt very specifically with the plaintiff's claim that there was no sufficient compliance with paragraph 28 in executing instruments to make a valid contract. We do not agree with the plaintiff. Paragraph 28 was not always observed. When business was done the officers at hand did it—at least frequently did it. That was clearly true of the change of rent. It was easy to find that there was a corporate act, though forms were not always observed, and this is true of the agreement surrendering the right to cancel without cause.

We have not covered by any means all of the claims of the parties. We have touched upon the controlling features of the case and have sought to consider those which may be of importance in the future.

Judgment reversed.

WILSON, C. J. (dissenting).

I concur in the result and in the entire opinion except as now stated.

I am of the opinion that Derrick was without authority to modify the contract and that defendant well knew that fact.

I think the evidence taken as a whole is manifestly contrary to a finding that Derrick had such authority.

Furthermore, I am of the opinion that the evidence taken as a whole is manifestly contrary to a finding of ratification even if there be some evidence tending to sustain a finding of ratification.

I am of the opinion that the record does not disclose that the officers of plaintiff had full knowledge of the alleged Derrick transaction at the time when it was claimed they ratified his acts, which are contained in the alleged letter, handicapped by a suspicious origin. I think, as a matter of law, ratification is not shown. Robie v. Holdahl, 180 Minn. 226, 230 N. W. 641.

The record in this case shows claims on the part of the defendant of such doubtful character that I believe, in view of the fact that there is to be another trial, they at least ought, in the interest of justice, to be left open for the consideration of another jury.

[1]Reported in 243 N. W. 682.