BASIN ELECTRIC POWER COOPERA-
TIVE, a corporation, Plaintiff
and Appellee,

v.

Delano W. LANG (# 13075); Elmer F.
Lang (# 13076); Jacob Lang (# 13077);
and Monrad Vikse (# 13078), Defend-
ants and Appellants,

and

Farmers Home Administration, Campbell
County, Elizabeth Lang, and 1st Na-
tional Bank of Linton, Defendants.

Nos. 13075–13078.

Supreme Court of South Dakota.

Argued Nov. 20, 1980.

Decided April 22, 1981.

John F. Murphy of Donley & Murphy, Elk Point, for plaintiff and appellee.

Richard E. Bleau, Herreid, Joseph A. Vogel, Jr., Mandan, N.D., for defendants and appellants.

WOLLMAN, Chief Justice.

Appellants are the individual owners of land in Campbell County, South Dakota. Appellee, Basin Electric Power Cooperative, commenced condemnation actions against appellants to obtain perpetual easements and rights-of-way over their separate tracts for the construction and operation of a 500,-000 volt electrical transmission line. By stipulation and order, the individual cases were consolidated and tried before a jury. The jury returned verdicts for appellants in the following amounts:

| | |
|---|---|
| Delano Lang | $4,700 |
| Elmer F. Lang | 5,500 |
| Jacob Lang | 6,200 |
| Monrad Vikse | 4,000 |

At the conclusion of the trial, appellants contended that appellee should also pay costs of $17,071.50. After a hearing, the trial court ordered taxation of costs against appellee of only $937.88. Appellants appeal from the judgments entered upon the jury verdicts and from the order of taxation of costs. We affirm.

Appellants' first contention is that the trial court committed reversible error in admitting Exhibit 41 into evidence. Exhibit 41 is a seventeen-page booklet entitled "Working Under High Voltage Transmission Lines—500,000 Volts or Less." This

booklet was compiled, published and distributed to various landowners by appellee. It attempts to explain the characteristics of high voltage lines, the effects of the lines on everyday living and how to work safely around the lines.

■ The issue at trial was the just compensation due the landowners for the decrease in value of their land sustained as a result of the high voltage line. During cross-examination of one of appellee's witnesses, however, appellants' counsel questioned whether appellee had informed landowners of the existence of the electric field around a high voltage line, and of studies regarding the possible effects thereof. The booklet was later introduced by appellee for the sole purpose of refuting appellants' contention that no information on possible effects of the high voltage line had been given to the affected landowners. The trial court admonished the jury that the only purpose of Exhibit 41 was to show what the landowners had been told and informed the jury that they did not have to accept the information in the booklet as accurate unless substantiated by other sources. The trial court and counsel made no further mention of the booklet. SDCL 19–12–3 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." The question whether such evidence should be excluded rests largely in the discretion of the trial court. *Drier v. Perfection, Inc.,* 259 N.W.2d 496 (S.D.1977).

■ Although we are cognizant of appellant's contention that Exhibit 41 contains some erroneous statements as well as information not otherwise litigated at trial, we conclude that the trial court did not abuse its discretion in view of the limited purpose for which the safety handbook was admitted and the trial court's admonition to the jury. We note that during the five-day trial nineteen witnesses testified and fifty-eight exhibits were introduced into evidence. Jurors are presumed to understand and to follow the court's instructions. *Mid-America Marketing Corp. v. Dakota Industries, Inc.,* 289 N.W.2d 797 (S.D.1980). There is no showing in the record that the jurors failed to understand or to follow the trial court's admonition regarding the limited purpose for which the challenged exhibit was received.[1]

Appellants' second contention is that the trial court erred in refusing to tax certain costs against appellee. Appellants' statement of costs totaled $17,071.50, which included expert witness fees and actual travel expenses in the amount of $10,505.36 for the two electrical engineers who testified on behalf of appellants. Pursuant to SDCL 19–5–1, the trial court allowed mileage at the rate of fifteen cents per mile and witness fees of four dollars per day.[2] Pursuant to SDCL 15–17–4, the trial court allowed as costs the transportation expense involved in

1. It may readily be conceded that the booklet, containing as it does attractive color photographs that portray, among other things, domestic and wild animals clustered contentedly on and about the supporting towers of an electrical transmission powerline, depicts rather idyllic, if not Edenic, settings, both rural and urban, of transmission lines of the type to be built upon appellants' properties. We are not prepared to say, however, that the members of a Campbell County jury would be so beguiled by the beauty of the scenes depicted as to disregard the trial court's admonition that they were to consider as factual only that evidence supported by in-court testimony.

2. At the time the order to tax costs was entered, SDCL 19–5–1 provided in pertinent part:

> Every witness shall be entitled to receive, for each day's attendance before any court, board, or tribunal . . . in all civil and criminal cases, four dollars, and for each day's attendance in magistrate's court or before any judge acting as a committing magistrate, three dollars, and for each mile actually traveled by the usual route of travel, one way fifteen cents. Such mileage shall be limited to the distance from the place of trial to the point where such witness first entered the state, if he comes from without the state. SDCL 19–5–1 has since been amended and the dollar amounts increased. 1980 S.D.Sess. Laws ch. 171.

procuring evidence.[3] The costs allowed by the trial court totaled $937.88.

▬ "[T]he taxation of costs was unknown to the common law, and the courts are without the inherent power to tax costs. The authority to tax such costs should not be implied, but must rest upon a clear legislative grant of power to do so." *City of Aberdeen v. Lutgen*, 273 N.W.2d 183, 185 (S.D.1979). "[I]tems of expense includible as costs can be taxed only by virtue of legislative enactment." *State Highway Commission v. Hayes Estate*, 82 S.D. 27, 44, 140 N.W.2d 680, 689 (1966). We conclude that the legislature has set forth in SDCL 19–5–1 and SDCL 15–17–4 the guidelines for determining the costs in question. Accordingly, the trial court did not err in taxing costs against appellee at the statutory rates and for the items allowed rather than in the amounts and for the purposes requested by appellants.

The judgments and order are affirmed.

DUNN, MORGAN and FOSHEIM, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

This case is a modern day version of Goliath slaying David. Goliath being Basin Electric Corporation, a corporation, plaintiff and appellee; David being the farmers whose land is affected, defendants and appellants; the defendants, Farmers Home Administration, Campbell County, Elizabeth Lang, and the First National Bank of Linton, none of whom submitted briefs or appeared before this Court, are essentially spectators to this unequal struggle. The arena was Campbell County. When the struggle was over, four farmers were awarded a pitifully small recompense for Goliath's right to have perpetual (a long time) easements and rights-of-way over their individual farm ground. Believing the battle to have been unfair, David now entreats this Court for a reversal of the judgments entered below and a new trial. The stone in David's pouch is that the trial court committed reversible error when it admitted appellee's Exhibit 41 into evidence over objection in that the exhibit was hearsay, prejudicial, and its preparers were not present and available for cross-examination. I would grant David a new trial and therefore respectfully dissent. Thus, I do not reach the costs issue as I would permit a legal struggle anew on just compensation.

This case, of course, is a condemnation case. Appellants had no right to stand their ground and refuse to give up their territory. Appellants were forced into court by appellees to whom they owed no obligation. Once there, they could not question the march of the transmission lines, like iron men, trodding across our South Dakota prairie. They were, therefore, vanquished from the beginning and appellee was triumphant in taking the land through the spear, sword, and shield of eminent domain. This left but one issue: just compensation for the landowner. *City of Huron v. Jelgerhuis*, 77 S.D. 600, 97 N.W.2d 314 (1959). Needless to say, it is highly incumbent upon our courts to see that the landowners are given a fair trial to insure just compensation in such a struggle. Without a fair trial, there is nothing left but to bow the knee in total submission (tyranny).

The necessity of the taking was not at issue. Yet, the preface of Exhibit 41 addresses necessity: "The planning and construction of transmission lines is done in response to the increasing electrical *needs* of these consumer-members [farmers and ranchers]. This planning is done jointly with other utilities when it appears the *best interests* of the consuming public can be served in this manner." (Emphasis supplied.) The best interests of the consuming

---

**3.** SDCL 15–17–4 provides:

In all cases where a party is allowed to recover costs the clerk must also tax as a part of the judgment the allowance of such party's witnesses', interpreters', translators', officers', and printers' fees, fees for the service of process, filing fees and the necessary expense of taking depositions and procuring necessary evidence.

public were not at issue. Appellees sought in this colored brochure, Exhibit 41, to establish the necessity of the taking. Moreover, to minimize the concerns of farmers and ranchers, the preface expresses objectives and goals while honeycoating the taking of their land with statements such as this: "The objective serves also as a major deterrent to building excessive numbers of transmission lines." Through this, totally irrelevant and prejudicial matters were put before the jury to influence its judgment in minimizing the damage award. Witnesses were not called to substantiate these self-serving declarations; cross-examination was therefore denied. Appellants were undeniably hurt by this preface. In my opinion, the preface itself constituted the admission of prejudicial matters. In *State Highway Commission v. Beets*, 88 S.D. 536, 224 N.W.2d 567 (1974), we held that prejudicial error is error which in all probability had some effect upon the final result of the trial, that is, the verdict of the jury. To parade before the jury, by a colored brochure, the goals and objectives of this utility company and the corresponding needs of the farmers and ranchers, was an issue not in the pleadings and not in the case. It obviously had an effect upon the jury, that is, a small jury award, and that is exactly why appellee placed Exhibit 41 into evidence, which was duly received over the strenuous objection of appellants.

Appellee, through Exhibit 41, portrayed the usage of appellants' land as an electrical blueprint to agricultural paradise. Evidence established that its birthplace was in Canada and compiled by a company called Ontario Hydro Electric. Including the cover, there are 26 colored drawings and photographs in the brochure. Appellants, in their brief, assert that the drawings and photographs are fraught with prejudicial, misleading, and damaging evidence which the jury was permitted to take into the jury room and consider. Appellants vehemently contend that appellee was permitted to thereby severely attack the credibility of their expert witnesses, Dr. Ordean Anderson and Dr. Charles Beck. It must be remembered that appellants were required to

go forward and carry the burden of proof with regard to damages. *City of Huron v. Jelgerhuis, supra.* By the receipt of this brochure into evidence, appellants contend that the testimony of these two experts was rebutted as to the health, safety, and detrimental effects of the high-voltage transmission lines without ever subjecting the statements made in the brochure itself to cross-examination. Moreover, appellants contend that the colored brochure placed direct evidence before the jury without requiring one expert witness under oath to appear before the jury to refute appellee's expert testimony. I agree with these contentions as they strike to the very heart of the jury system. A trial is to resolve issues of fact. There were issues of fact to be determined in this condemnation case, particularly the impact of these transmission lines upon appellants' land. Cross-examination is created and vented to bring out the truth. Our jury system depends upon and demands the opportunity for cross-examination. Here, questionable scientific and technological data was set forth in the colored brochure, as well as a plethora of subjective data. Appellee's counsel called a witness who admitted that he had brought back a similar brochure from Canada which was used as a basis to compile Exhibit 41 by the staff of appellee. When appellants' counsel attempted to find out on cross-examination the truth of the matters contained in the brochure, the following colloquy took place:

Q. [By appellants' counsel]: Do you know if Basin conducted the tests which would be the basis for the information in this pamphlet?

A. [By witness called by appellee]: I don't know if Basin has done any tests. I really don't.

The introduction of Exhibit 41 was no small matter in this trial. Indeed, it was hotly disputed. It was a major issue in the trial and it cannot be lightly discounted at the appellate level. The record reveals that trial counsel went into chambers and a verbatim record was made. Counsel for appellee contended that the exhibit should be received by the court to refute the implica-

tions that no information was provided by appellee to the landowners as to the possible effects of the imposition of the transmission line. Thereupon, counsel for appellants vigorously protested its admission into evidence and stated (emphasis supplied):

> Mr. Vogel: If I may respond, Your Honor, if counsel considers that to be an important issue, *he sure as hell can put on a witness and that can testify and has testified that the land owners were contacted.* He spent 15 minutes on an elaborate dissertation as to how the contact was made, and that problems involved with the transmission line were explained to him. But this goes one step further. This actually introduces into the record information which will be provided to the jury from individuals who are not here testifying, and available for cross-examination.
>
> Now, this witness, he's here for cross-examination, and he can testify as to what the landowners were told and how the procedure was set up, and you can cross-examine him. But I can't cross-examine the people that put that booklet together; even more difficult from the standpoint on [sic] the landowners is that there was testimony that most of these tests, he believes, and he doesn't know for sure, were performed by a utility company in Canada, Ontario Hydro Electric.

Notwithstanding this timely, strong, and pertinent objection the trial court permitted the exhibit to go into evidence and allowed the jury to fully consider the technical data therein. True, there was an admonition to the jury because the court recognized that it was getting into evidence trouble. The court expressed to the jury: "This is only to show what the landowners have been told. You don't have to accept the information in here as accurate until it is substantiated by evidence from other sources." But the important point to recognize is that the information was never substantiated and the jury received the exhibit to consider. Indeed, appellants contend that this Madison Avenue type, image-polishing public relations brochure contained the following false information (and which cross-examination could have conceivably produced the truth):

1. With respect to electrostatic charges on page 2, it stated that a light charge could build up and "such a sensation would be similar to that experienced after walking across a carpet and touching a door knob". Appellants contend that it could be fatal.

2. As pertains to charges building up on vehicles, page 3 recited that "though they can be annoying, such charges are harmless regardless of the vehicle's size or the length of time it is left under the lines". Under certain conditions, appellants contend that this can be fatal to a farmer operating a vehicle.

3. On page 5, appellants expressed "it is recommended that equipment or people should not come closer than six feet to any energized high voltage conductor". Appellants maintain that this is absolutely false and that the National Electrical Safety Code bears them out.

4. Appellants urge that appellees deceived the public on page 5 in telling them that refueling should not be accomplished within 50 feet of a high voltage line. Appellees contend that a safe distance is 200 feet from the center line of the high voltage line.

5. On page 6, appellants advocate that appellees deceived the public by certain language, the clear implication of which is that only buildings in the right-of-way would be affected, where as in truth and in fact all buildings out to a minimum of 400 feet would be severely affected by induced voltages and corrosive effects.

6. Finally, appellants contend that page 13 is a fabrication by expressing that interference with television and radio reception should not be experienced beyond the edge of the right-of-way and cross-examination would have brought out the truth.

With cross-examination, appellants contend that witnesses for the appellee would have to substantiate these conclusions by tests made or actual observations. Then, the jury would be armed with the necessary testimony to test the credibility of these self-serving declarations. I view the admission of this exhibit as rank hearsay and an absolute violation of the rules of evidence, contrary to the spirit of fair play in our adversarial system. When one party to a lawsuit can introduce an entire case into evidence in one exhibit without any foundation as to the validity of the statements therein, the rules of evidence have run amok. I would not bless its admission; rather, I would censure it. The supposed probative value of Exhibit 41 was to establish that landowners were contacted about the impact of the transmission line. However, this had already been established and the exhibit was thus cumulative.[1] Furthermore, its value was simply miniscule compared to the unfair prejudice and confusion of issues created thereby. I would therefore hold that the trial court abused its discretion in allowing, without foundation and without cross-examination, this highly prejudicial evidence to be received and go into the jury room for the jury's deliberations. *See* SDCL 19–12–3 and *cf. Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1979).

In *Podio v. American Colloid Co.*, 83 S.D. 528, 162 N.W.2d 385 (1968), this Court held that, in a workmen's compensation hearing, medical books or treatises are not admissible to prove the truth of statements contained therein. The Commissioner at the hearing was assumed to have relied on statements made in these materials when arriving at his findings. The *Podio* Court rationalized its holding by stating that "[the

medical treatise] placed before [the Commissioner] medical evidence, the truth or applicability of which the appellants had no opportunity to challenge by cross-examination or otherwise." 83 S.D. at 535, 162 N.W.2d at 389.

Although the facts of *Podio* and this case are different, I believe the rationale of *Podio* is applicable to the use of Exhibit 41 in this case; that is, when the trial court allowed Exhibit 41 into evidence despite the lack of appellant's opportunity to cross-examine its authors, prejudicial error was made.

The following are pertinent quotes from 32 C.J.S. Evidence § 717 (1964):

Generally, as a prerequisite to introduction in evidence of handbooks or other publications of organized occupations, a preliminary foundation must be laid, by showing that such publications are based on reliable sources of information or that they have been regularly prepared for use of the trade or profession and are generally relied on as trustworthy.

As a general rule a book or other publication printed by a private person and not shown to be approved by any public authority is not competent evidence of the facts stated therein[.]

Examples: A manual of accident prevention in construction work issued by a contractors' association was held inadmissible. *McEachin v. Martin*, 193 Ark. 787, 102 S.W.2d 864 (1937); a field manual of policies and instructions issued by an automobile manufacturer to dealers was held inadmissible. *Oakland Motor Car Co. v. Kremer Motor Co.*, 186 Minn. 455, 243 N.W. 673 (1932). *See also Nashban Barrel & Con. Co.*

---

1. Q. [By Mr. Murphy] In connection with this particular project that we're talking about now, in the course of your informational meetings and in the course of your meetings with landowners, did you prepare and did you provide the landowners that were going to be affected by this line with any type of information as to working conditions under a 500,000-volt line?
A. [By his witness] Yes. In reference to what Mr. Vogel was talking about earlier on electrical effects, of which I know very little,

we had a safety handbook prepared that we would hand out to all landowners trying to advise them of—there was a possibility of some kind of shocks that might occur under the transmission line, or the minimum clearance, so this booklet was put together and handed out to each and every landowner on the Antelope Valley project, and after it was handed out to the landowner, I had each agent document that on memorandum agreements so that I would know that everybody had a safety handbooklet.

*v. G. G. Parsons Trucking Co.*, 49 Wis.2d 591, 182 N.W.2d 448 (1971); 6 Wigmore, Evidence (3d ed. 1940), p. 26, §§ 1702, 1704. Here, there was no foundation showing *any* source for the information other than the brochure being originally prepared in Canada and warmed over in the United States by Basin Electric. Testimony established that Basin Electric's staff prepared and printed the brochure.

Exhibit 41 contains both drawings and photographs. The last two pages, pages 16 and 17, consist of ten colored photographs depicting transmission towers and lines all happily interwoven into family farm life. Not one word of explanation is addressed to the specific pictures. These pastoral scenes were so inserted to portray Goliath in a favorable light and to minimize the social and environmental impact upon the lands of David. It was placed before the jury to portray that there were no damages or potentiality for damages. If the adage that "a picture is worth a thousand words" is a truism, then these photographs had the additional effect of producing to the jury thousands of additional words that were not subject to cross-examination.

Not only in this case, but in all cases where the utilities take and use the precious farm ground of our state to perpetually profit their corporate coffers, I would think that the man who bears the burden should be justly compensated and that those who impose this burden would sense their responsibility to be fair. There was no fairness in this Goliath. I would reverse and remand for a new trial as David was denied his just day in court.