McEACHIN *v.* MARTIN.

4-4556

Opinion delivered March 15, 1937.

*Buzbee, Harrison, Buzbee & Wright,* for appellants.

*V. D. Willis* and *Shouse & Walker,* for appellee.

SMITH, J. Appellee was employed by appellant as a laborer in the construction of a sewer system in the city of Harrison. A sewer ditch was dug with a machine adapted to that purpose. The bottom of the ditch was level so the sewage would flow through the sewer pipes. The depth of the ditch varied according to the undulations of the surface of the earth. Appellee was working as a pipe-laying helper and engaged in work connected with the sealing of the joints laid at the bottom of the ditch, which was from six to nine feet deep at the place where appellee was employed at the time of the injury to compensate which this suit was brought, and from a judgment in his favor is this appeal.

The excavated earth was piled on both sides of the ditch, the amount and heighth thereof depending on the depth of the ditch. The case was tried upon the theory that it was the master's duty to pile this earth far enough from the edge of the ditch to prevent the earth and rock which had been excavated from rolling down and falling into the ditch where men were working, like appellee, in laying pipe, and that the master had been negligent in not leaving a sufficient berm or space between the piles of earth and the edge of the ditch.

The question of fact was submitted to the jury whether the master had been negligent in failing to furnish a reasonably safe place for the servant to work, by leaving a sufficient berm or space between the piles of earth and the sides of the ditch, and appellee's testimony is to the effect that the master had been negligent in this respect. Without reciting the testimony, it may be said that it was sufficient to support the finding of the jury that the master had been negligent in this respect, although the testimony of appellant McEachin and that of Whaley, the superintendent, and of Steel, the operator of the machine, used in digging the ditch, was to the contrary.

Appellant interposed the defense of assumed risk, the contention being that the hazards of the employment were constant, open and obvious. It is a physical fact that as the piles of earth became higher and the berm or intervening space between the piles and the edge of the ditch became narrower the danger became greater; but the question of fact remained whether these risks were assumed, especially as appellee was engaged below the surface of the earth in those parts of the ditch which were that deep, as was the case at the time and place of appellee's injury.

Appellant interposed also the defense that appellee's injury was caused by the negligence of a fellow-servant in stepping upon a wire fence upon which earth and rock had been placed, which action on the part of the fellow-servant set in motion a large rock, which rolled from the pile of earth and rock into the trench, causing the rock to fall upon appellee and injure him.

It is insisted by appellee that this defense is not available, for the reason that if the fellow-servant negligently put the rock in motion, that action would not have caused the injury but for the concurring negligence of the master in failing to make appellee's place reasonably safe in the particulars hereinbefore stated.

It was said in the case of *The Railways Ice Co.* v. *Howell,* 117 Ark. 198, 206, 174 S. W. 241, that "In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Corman,* 92 Ark. 102, 122 S. W. 116, the court held that a servant is entitled to recover for the negligence of the master, even though the negligence of a fellow-servant concurred therein if the injury would not have occurred but for the master's negligence." Appellee cites numerous other cases to the same effect. But we cannot say as a matter of law that the master was negligent; and, if not, the negligence of the fellow-servant, if the proximate cause of the injury, would have been a defense. The question whether the fellow-servant was negligent was one of fact for the jury, as was also the question whether the master was negligent.

Error is assigned in giving instruction No. 1, and in admitting certain testimony, over appellant's ob-

jections, which assignments of error will later be discussed.

The trial from which this appeal comes was presided over by the Hon. A. S. Irby, the chancellor of the Eighth chancery district, under an agreement for exchange of courts with the Hon. Jack Holt, the regular presiding judge of the circuit in which the trial was had. It is insisted that the proceeding was *coram non judice,* for the reason that the exchange agreement was unauthorized by valid law.

Act 160 of the Acts of 1933, page 490, expressly authorizes circuit judges and chancellors of the state to temporarily exchange courts and districts by agreement, for such length of time as may be practicable and for the best interest of their respective circuits and districts and courts. The act declared the intent and purpose thereof to be "* * * to permit circuit judges to exchange circuits with each other; to permit chancellors to exchange districts with each other; and to permit circuit judges to exchange circuits with chancellors; and to permit chancellors to exchange districts and circuits with circuit judges." Authority for the exchange between Judge Holt and Chancellor Irby appears ample if act 160, *supra,* is valid legislation. Is it such?

In approaching the decision of this question the well-established rule of construction should be kept in mind that legislation will not be declared unconstitutional unless obviously so, and that all reasonable doubt upon the subject must be resolved in favor of the constitutionality of the legislation.

The Constitution of 1874 divided the state into eleven judicial districts and fixed the time for holding the courts therein until otherwise provided by the General Assembly. Authority existed—and has frequently been exercised—to change these circuits and to increase the number thereof, and all of them had chancery jurisdiction. By § 44 of art. 7 it was provided that "The Pulaski chancery court shall continue in existence until abolished by law." By § 15 of art. 7 it was provided that "Until the General Assembly shall deem it expedi-

ent to establish courts of chancery the circuit courts shall have jurisdiction in matters of equity, subject to appeal to the Supreme Court, in such manner as may be prescribed by law." The circuit courts and the chancery courts were one and the same and were presided over by a judge having jurisdiction as judge and as chancellor, except the Pulaski chancery court.

It was provided by § 22 of art. 7 of the Constitution that "The judges of the circuit courts may temporarily exchange circuits or hold courts for each other under such regulations as may be prescribed by law." We think it obvious that the words "circuit courts" were used in a comprehensive sense, including within their meaning chancery courts as well. Throughout the judicial history of the state no one ever questioned the right of one circuit judge who had exchanged circuits with another judge to exercise the full jurisdiction possessed by the judge with whom the exchange was made. For the purpose and during the time covered by the exchange agreement each judge possessed all the powers and jurisdiction of the judge with whom he had exchanged. He was both circuit judge and chancellor, because chancery courts were comprehended and included in the words "circuit courts." That § 22, above quoted, refers alike to courts having chancery jurisdiction as well as to circuit courts or, rather, intended both courts to be comprehended by the words "circuit courts," appears from the use of the same words, "circuit courts," in § 21 of art. 7. This section provides that "Whenever the office of judge of the circuit court of any county is vacant at the commencement of a term of such court, or the judge of said court shall fail to attend, the regular practicing attorneys in attendance on said court may, on the second day of the term, elect a judge to preside at such court." If the words "circuit courts" did not comprehend and include chancery courts as well, then no authority existed for the election of a presiding judge possessing chancery jurisdiction. The unbroken and unquestioned practice reflected in innumerable decisions of this court compels the conclusion that such courts were treated as one and the same, and were to be so regarded

until the creation of separate chancery courts, the judges thereof prior to the separation possessing jurisdiction of all criminal, law and chancery cases. Chancery courts are as much constitutional courts as are circuit courts. They existed under the Constitution as integral parts of the circuit courts, and became separate courts only when the power to separate, conferred by the Constitution, had been exercised.

Section 16 of art. 7 of the Constitution provides the qualifications of circuit judges. It is silent as to the qualifications of chancellors, and this omission is explained by saying that the circuit judges were chancellors, and the circuit courts were the chancery courts except only in the case of the Pulaski chancery court. The provisions of art. 7 relating to such courts, both circuit and chancery, remained effective after their separation, and the provision for exchange of courts is as effective as to the one as it is to the other. The reasons inducing the framers of the Constitution to confer the power to exchange are as applicable to one as they are to the other. So far as we are aware no one has ever contended that the framers of the Constitution intended that a circuit judge might exchange circuits with some other circuit judge for the trial of law and criminal cases only. On the contrary, the uniform interpretation of the Constitution was that when an exchange was made each judge possessed the same jurisdiction, while serving on exchange, as was possessed by the judge with whom he had exchanged. He became both the circuit judge and the chancellor of the district to which the exchange agreement carried him, so long as that agreement was effective. He carried with him, under the exchange agreement, the power to act both as circuit judge and as chancellor. The jurisdiction of these courts was always separate and distinct, but was exercised by the same officer by acting as circuit judge in law cases and as chancellor in equity cases.

The case of *Gladish* v. *Lovewell*, 95 Ark. 618, 130 S. W. 579, makes clear the fact that chancery courts, even before they were separated from the circuit courts, possessed the jurisdiction conferred by the Constitution,

which could not be—and has not been—enlarged or diminished by subsequent legislation. In construing § 15 of art. 7, which is the section of the Constitution conferring upon the General Assembly the power to establish separate chancery courts, Judge HART said: "In construing a similar provision of the Constitution of 1836, this court held that it meant such jurisdiction as a court of chancery could properly exercise at the time of the adoption of the Constitution. *Hempstead* v. *Watkins,* 6 Ark. 317, 42 Am. Dec. 696. Hence, it follows, as held in the case of *Hester* v. *Bourland,* 80 Ark. 145, 95 S. W. 992, that, while the Legislature is vested with power to create courts of chancery, and to vest such chancery courts with jurisdiction 'in matters of equity,' it has no power to enlarge their jurisdiction when created."

Act 160, *supra,* permitting circuit judges and chancellors to exchange, does not attempt to enlarge or to diminish the jurisdiction of either circuit courts or of chancery courts. It only allows the judge of one court to hold the court of the other as provided by § 22 of art. 7. When a chancellor, pursuant to act 160, presides over a session of a circuit court, he does so as a circuit judge, and not as a chancellor. He has the same jurisdiction—and no other—as is possessed by the judge in whose stead he presides. Such an agreement, made before the creation of separate chancery courts, would have conferred jurisdiction to sit both as chancellor and as circuit judge, because the same official filled both offices; but since the separation of the courts the exchanging judges possess the jurisdiction only of the judges with whom they have exchanged. If § 22 of art. 7 does not confer power upon chancellors to exchange courts, then they are without that power, and they may not exchange either with circuit judges or with other chancellors.

The General Assembly, in 1903, exercised the power conferred by the Constitution of establishing separate chancery courts in all the counties of the state, and every county was assigned to some one of the eleven chancery districts there created. Act 166, Acts of 1903, page 314.

Section 18 of this act of 1903 authorized the several chancellors of the state to exchange and hold courts for each other as in the case of circuit judges. The validity of this section has never been expressly upheld, as no case has challenged its validity, but a number of cases assumed its validity without expressly so deciding. For instance, the case of *Kory* v. *Dodge,* 174 Ark. 1156, 298 S. W. 505, was one in which two chancellors had exchanged for a specified day. Their authority to exchange was not questioned, but the agreement for the exchange was held to be limited to the day specified, and to be of no validity on a later day. It was there said that "* * * the chancellor of the First district had full authority to preside and to make any order or decree on that day which the regular chancellor might have made, but his authority to preside and hold court was limited to that day of the term by the agreement for the exchange."

The act of 1903 has now been in effect for thirty-four years, during all of which time its validity has been unquestioned by bench or bar, and while this practice is not conclusive it is highly persuasive of the validity of § 18. Section 608, Chapter on Statutes, 59 C. J. 1023; Lewis' Sutherland on Statutory Construction, vol. 2, (2d ed.,) § 477.

Chancellors have, under the Constitution, the same right to exchange which circuit judges have, and there is no limitation of this power restricting the right of a circuit judge to exchange only with another circuit judge or a chancellor to exchange only with another chancellor. It is, therefore, the opinion of the writer, and of Justices HUMPHREYS, McHANEY and BAKER, that chancellors may exchange with circuit judges as well as with other chancellors.

The court gave over appellant's objection an instruction numbered 1, reading as follows: "You are instructed that it is the duty of the master to exercise ordinary care to furnish the servant a reasonably safe place and reasonably safe conditions and surroundings in which to work. In this case, if you believe from a preponderance of the testimony that the defendant company, McEachin Construction Company, negligently

failed to exercise ordinary care to furnish the plaintiff, E. L. Martin, a reasonably safe place and reasonably safe conditions and surroundings in which to work and that as a direct result of such negligence on the part of the defendant the plaintiff, without any negligence on his own part, was injured, then you should find for the plaintiff in such sum as you believe from a preponderance of the evidence will reasonably compensate him for the injuries, if any, sustained.''

The specific objection was made that the instruction ignored material defenses of appellant; and we think the objection is well taken. It is thoroughly settled that an instruction which undertakes to state the conditions essential to and justifying a recovery on the part of the plaintiff must not ignore any defense which the defendant has offered competent testimony to sustain. This instruction numbered 1 contains no reference to the defenses of assumed risk or the negligence of a fellow-servant, and it is erroneous for that reason.

It is insisted that if the instruction numbered 1 is erroneous in this respect the error was cured by instruction numbered 2, which reads: "You are further instructed that while the plaintiff assumed all the risk ordinarily incident to the work in which he was engaged, he did not assume the risk of negligence, if any, of the defendant construction company, in its failure to exercise ordinary care to keep the place and surroundings in which he was working in a reasonably safe condition, if it failed to do so, unless he knew, or by the use of ordinary care could have known, of such negligence, if any.''

Prior to the case of *Temple Cotton Oil Co.* v. *Skinner*, 176 Ark. 17, 2 S. W. (2d) 676, there was a conflict in our decisions as to the effect of a correct instruction immediately following one which was not correct, there being cases to the effect that by reason of their juxtaposition the two instructions should be read together as constituting a single instruction, the latter qualifying the former. This condition existed in the Temple case, *supra,* and we there announced the rule to be hereafter followed. After reviewing this conflict, Chief Justice HART there

said: "The result of our views is that it is established as a settled law of this state by the decision in *Garrison Co.* v. *Lawson*, 171 Ark. 1122, 287 S. W. 396, and *Natural Gas & Fuel Co.* v. *Lyles*, 174 Ark. 146, 294 S. W. 395, that an instruction is inherently erroneous, and therefore prejudicial, which leaves out of consideration the plaintiff's contributory negligence or his assumption of risk, and leaves to the jury the determination of the defendant's conduct, as the sole issue of the jury's verdict, by concluding with the phrase, 'you will find for the plaintiff,' since, under the evidence, the conduct of the plaintiff as well as that of the defendant is essential to a proper verdict."

That holding was expressly reaffirmed in the case of *Spadra Coal Co.* v. *White*, 188 Ark. 568, 66 S. W. (2d) 1072.

But, if this were not the rule which we stated would hereafter be followed as the settled law of this state, instruction numbered 2 did not cure the error appearing in instruction numbered 1. This instruction numbered 2 does not tell the jury that an injury resulting from a risk of danger assumed by the servant would prevent a recovery. This is the essence of the doctrine of assumed risk, and that declaration is omitted from the instruction. It appears that the purpose and effect of instruction numbered 2 is not to declare the effect of a risk assumed by the servant, but, rather, to advise the jury that the plaintiff did not assume the risk of negligence of the defendant in a failure to exercise ordinary care to keep the place and surroundings in which plaintiff was working in a reasonably safe condition.

The writer, the Chief Justice and Justices McHaney and Baker are, therefore, of opinion that instruction numbered 1 was error calling for the reversal of the judgment.

Testimony was offered that the construction contract between appellant and the city of Harrison contained a section providing that "All machinery and equipment and other hazards shall be guarded in accordance with the safety provisions of the manual of Acci-

dent Prevention in Construction of the Associated General Contractors of America, unless and to the extent that such provisions are incompatible with Federal, State or municipal laws or regulations.''

Over appellant's objection lengthy excerpts from this book were read to the jury dealing with precautions which should be taken in construction work. In offering this book in evidence counsel for appellee stated: ''We offer this, not as evidence of breach of contract, but evidence that the construction company (appellant) recognizes this manual of rules as standard rules of safety for similar work as this.''

We think this was error. Much of the matter was irrelevant to the question of negligence in this particular case, and was of a technical nature which would have required explanation. It was competent to ask a witness, sufficiently qualified to testify, as to the methods in general use in this type of construction. The test of negligence is to determine what an ordinarily prudent man would do under the same or similar circumstances. It would not have been improper to inquire of the witness if the experience of construction contractors in similar work had crystallized into rules regulating the manner of doing similar work, and as to what those rules were, this being for the purpose of determining what ordinary care required, and it would not have been improper for the witness to say what the rule was, if the rule applied to the facts of this case.

The subject of the admissibility of technical treatises as independent evidence is extensively annotated in the case of *Watkins* v. *Potts,* 65 A. L. R. 1102, and the general rule appears to accord with the statement above made. Among the cases there cited is our case of *Feige* v. *State,* 128 Ark. 465, 194 S. W. 865, where it was held that excerpts from medical books could not be read to the jury as original and affirmative evidence, although it was held proper to read extracts from standard medical authorities upon the subject-matter involved to an expert witness, and to ask him whether he agrees or disagrees with the authorities, to test the knowledge of the

expert and to ascertain the weight to be given his testimony.

It is the sole function of the jury, under the instructions of the court, to determine whether the facts in evidence constitute negligence. *Little Rock Traction & Electric Co.* v. *Nelson,* 66 Ark. 494, 52 S. W. 7. A witness may not state what is negligence, and what is not. To do so would usurp the function of the jury, but he may state what course of conduct is ordinarily pursued under similar circumstances; and if this course of conduct has crystallized into a rule he may state what that rule is, whether it has been printed or not, but he may not confuse the issue of negligence by introducing general rules more or less inapplicable.

It is the opinion of the writer and of the Chief Justice and of Justices McHaney and Baker that error was committed in the introduction of the book of rules.

It follows, from the conflicting views herein expressed, that, for the reasons stated, the judgment must be reversed, in which conclusion all the judges concur except Justice Humphreys.

The judgment is, therefore, reversed, and the cause will be remanded for a new trial.

Mehaffy and Butler, JJ., concur. Humphreys, J., dissents.